UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

_____

In re:

        NIRVANA, INC., *et al.,* [1]

                             Debtors.

                                    Chapter 11 Case
                                    Case No. 15-60823
                                    Main Case
                                    Joint Administration Requested

_____

### AFFIDAVIT OF MOZAFAR RAFIZADEH IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS AND PURSUANT TO LOCAL RULE 2015-2

STATE OF NEW YORK    )
                         ) ss.:
COUNTY OF ONEIDA    )

Mozafar Rafizadeh, being duly sworn, hereby deposes and says:

1.     I am the president of Nirvana, Inc. ("Nirvana"), Nirvana Transport, Inc. ("Transport") and Nirvana Warehousing, Inc. ("Warehousing"), and the vice president of Millers Wood Development Corp. ("Millers Wood"), the debtors and debtors in possession in the captioned chapter 11 cases (collectively, the "Debtors"). In my capacities as an officer of the Debtors, I am familiar with all aspects of the Debtors' businesses and operations.

2.     To enable the Debtors to minimize the adverse effects of the commencement of these chapter 11 cases on their businesses, the Debtors have requested various types of relief in their "first day" pleadings and applications (each a "First Day Pleading"). The First Day Pleadings seek relief intended to allow the Debtors to effectively transition into chapter 11 and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Nirvana, Inc. (5474), Nirvana Transport, Inc. (6503), Nirvana Warehousing, Inc. (2646) and Millers Wood Development Corp. (8040).

minimize disruption of the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates.

3.      I submit this Affidavit in support of the chapter 11 petitions filed by the Debtors on June 3, 2015 and the First Day Pleadings filed on June 3, 2015[2] and in compliance with Local Rule 2015-2.  I am familiar with the contents of each First Day Pleading (including the exhibits and schedules thereto) and I believe that the relief sought in each First Day Pleading: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful restructuring of the Debtors; and (c) best serves the Debtors' estates and creditors' interests.

4.      Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my review of relevant documents, my opinion, my experience and knowledge of the Debtors' operations and financial conditions, or are based upon knowledge of employees of the Debtors reporting to me that is derived in the course of his/her duties.  If I were called upon to testify, I could and would testify to the facts set forth herein.  I am authorized to submit this Affidavit on behalf of the Debtors.

5.      Part I of this Affidavit describes the Debtors' businesses and the circumstances surrounding the filing of their chapter 11 petitions.  Part II of this Affidavit sets forth the relevant facts in support of the various first day applications and motions filed by the Debtors contemporaneously herewith.

---

[2] All capitalized terms used but not defined herein shall have the same meanings ascribed to them in the relevant First Day Pleadings.

2493030.2 6/3/2015

## PART I - BACKGROUND

6.      On June 3, 2015 (the "Petition Date"), the Debtors filed separate, voluntary petitions for relief under chapter 11 of title 11 of the United States Code, U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code") with the United States Bankruptcy Court for the Northern District of New York (the "Court").

7.      The Debtors remain in possession of their respective assets and continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these cases and, as of the date hereof, no official committees have been appointed or designated.    Concurrently herewith, the Debtors have filed motions seeking the joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## THE COMPANIES

8.      Nirvana is a manufacturer and bottler of spring water that is captured from four[3] natural springs on 1,600 acres of property located in the foothills of the Adirondack Mountains at Forestport, New York.  The Debtors are four affiliated companies that each plays a specific functional role in the overall bottling operation.  Nirvana is the core business that produces and packages the bottled water.  Transport provides transportation services to Nirvana and other parties.  Millers Wood is the real estate holding company that owns the 1,600-acre property and Warehousing provides warehousing services for Nirvana.

---

[3] Additional springs may be available for use.

2493030.2 6/3/2015

### A.    Nirvana, Inc.

9.    Nirvana is a closely-held New York corporation with a principal office and place

of business located at One Nirvana Plaza, Forestport, New York 13338[4].  Nirvana was formed on

June 2, 1995 by me and my brother, Mansur Rafizadeh.  Mansur is the chairman and I am the

president and chief executive officer of the company.  We each own 50% of Nirvana's common

stock.  We are assisted in the operation of the company by Chief Financial Officer Edward Wiehl

and several managers.  Nirvana employs 50 full-time employees at its Forestport location, plus

five (5) sales representatives in the downstate New York/New Jersey area, for a total of 55

employees.  All employees are non-union.

10.    The spring water bottled by Nirvana comes to the surface by its own natural force

at 42° Fahrenheit year round and is collected and bottled on site.  The springs produce

approximately 605,000 gallons of water each day.  The water is sold in a number of bottle sizes

and configurations, all presented under the company's "Nirvana Natural Spring Water" brand.

Nirvana sells its spring water to leading supermarket chains, mass merchandisers, convenience

store chains and drug store chains directly and through distributors, predominately in the

Northeast United States.

11.    Nirvana operates as an integrated process flow manufacturer.  Using state-of-the-

art equipment at its 285,000 square foot facility, Nirvana can operate its plant on a 24/7 basis to

capture the natural spring water available on its property, filter the water, manufacturer PET[5]

bottles and caps, fill the bottles and package the filled bottles for distribution.

12.    From 1995 until 2000, Nirvana operated as a co-packer, bottling its water under

contract for other bottling companies by filling water into pre-manufactured plastic bottles which

---

[4] The Debtors' physical address is 12044 State Route 12, Boonville, New York 13309.
[5] Polyethylene terephthalate, a form of polyester that can be molded into plastic bottles, food and beverage
containers and other consumer products.

2493030.2 6/3/2015

it purchased by the truckload.  The bottle costs plus the trucking expense, however, put Nirvana at a competitive disadvantage with its integrated competitors.  In 2003, Nirvana acquired a blow molding machine which allowed it to manufacture its own bottles at a lower cost.  In 2008, Nirvana undertook a major plant expansion to increase bottling capacity in response to its acquisition of several new customers.  From 2003-2010, Nirvana was a leading co-packer for several major national brands, including WalMart, Wegmans, 7-11, Wawa and others while also providing Nirvana-branded product to the marketplace.

13.    In 2009, as competitive pricing pressures eroded the profitability of its co-pack/private label business, Nirvana elected to emphasize its own branded product and began building its own distribution network.  By the end of 2010, sales rose to 9.4 million cases annually and increased to over 11 million cases in 2011.  Nirvana's main competitors in the Northeast market are Nestle Waters North America (Poland Spring, Deer Park Arrowhead), Pepsico (Aquafina) and Coca-Cola (Dasani).

14.    As volume grew in 2011, however, Nirvana experienced a significant capacity issue, which it sought to address by undertaking a $12 million expansion project that would add over 8 million cases of capacity to the bottling operation.  Financing was arranged through the Tennessee Commerce Bank ("TCB") and equipment was scheduled for installation in early 2012.  Unfortunately, the subsequent failure of TCB and its take-over by the Federal Deposit Insurance Corporation (the "FDIC") delayed the project by 18-24 months.  This delay, and the consequent capacity constraints, caused Nirvana to transition to its branded product more rapidly than was planned, and was instrumental in Nirvana both sacrificing private label sales and missing out on sale opportunities during both 2012 and 2013.

2493030.2 6/3/2015

15.     By the end of 2011, Nirvana had essentially completed the transition from the co-pack/private label business to the more valuable Nirvana branded water business.  The expansion project was finally completed in August 2013.   Although the company was successful in establishing its branded product in the Northeast, the effort was costly, as slotting fees, promotional support agreements, prepaid advertising and distributor charge-backs eroded profitability.  This decline in profits and available cash flow have resulted in Nirvana being unable maintain its operations while servicing the obligations due its lenders, which obligations are described in more detail below.

16.     Nirvana's assets include non-insider accounts receivable totaling approximately $1,809,949.37, machinery and equipment valued at approximately $6,757,275.00, inventory valued at approximately $1,365,022.96, vehicles valued at $103,500 and intellectual property with an unknown value.  Its liabilities include $27,204,092.28 owed to the Prepetition Secured Lenders (defined below), priority unsecured claims totaling $2,336,389.73[6], and non-insider general unsecured claims totaling approximately $3,880,855.66[7].  Both Nirvana and Transport have been, or are, parties to vendor collection actions seeking to recover outstanding amounts due.

## B.  Nirvana Transport, Inc.

17.     Transport is a closely-held New York corporation with a principal office and place of business located at One Nirvana Plaza, Forestport, New York 13338.  I formed Transport on October 12, 2004 and am the president and sole shareholder of the company.

18.     Transport provides trucking services for Nirvana and other entities.  It arranges for the transport of Nirvana products, via common carriers, to customers throughout the

---

[6] Of this amount, amounts aggregating $2,333,014.73 are owed as bottle deposits to the New York State, Connecticut and Maine taxing authorities.
[7] Of this amount, approximately $1,112,151.12 is owed to bottle recycler TOMRA.

2493030.2 6/3/2015

Northeast and mid-Atlantic region. Transport has three (3) full-time non-union employees. Its assets include fixtures and equipment valued at approximately $10,000.00, non-insider accounts receivable totaling $80,852.25, surety deposits and bonds totaling approximately $100,000.00 and cash in its operating and payroll accounts totaling approximately $11,000.00. Other than the liabilities owed to the Prepetition Secured Lenders totaling $27,347,317.28, Transport's primary liabilities include unsecured accounts payable totaling approximately $1,202,954.77.

### C. Nirvana Warehousing, Inc.

19.    Warehousing is a closely-held New York corporation with a principal office and place of business located at One Nirvana Plaza, Forestport, New York 13338. I formed Warehousing on March 30, 2007 and am the president and sole shareholder of the company.

20.    Warehousing provides storage operations for the millions of cases of bottled water that are produced by Nirvana. It operates out of a 135,000 square foot facility at the Forestport property and employs 14 full-time non-union employees. Warehousing has no assets other than its payroll account, and its liabilities include the obligations owed to the Prepetition Secured Lenders and the accrued wages and benefits owed to its employees in the ordinary course of business.

### D. Millers Wood Development Corp.

21.    Millers Wood is a closely-held New York corporation with a principal office and place of business located at One Nirvana Plaza, Forestport, New York 13338. It was formed on March 27, 1992 by Mansur Rafizadeh, who is the president and sole shareholder of the company.

22.    Millers Wood is the owner of five (5) parcels of real property aggregating approximately 1,679.15 acres located in Forestport, Town of Boonville, County of Oneida, State of New York, covering approximately one square mile, bordered on the west by State Route 12

2493030.2 6/3/2015

and on the east by the Black River (the "Real Property"). The Real Property was purchased by

Mansur Rafizadeh, individually, between 1974 and 1978 and was originally operated as a dairy

farm. Mr. Rafizadeh has resided in the house at the Real Property since 1976. On June 10,

1992, Mr. Rafizadeh transferred ownership of all five parcels to Millers Wood, and the water

bottling operations commenced after Nirvana's incorporation in 1995.

23.    Two of the five parcels are adjacent to each other and are improved by the house

and various commercial structures that are occupied by Nirvana, Transport and Warehousing and

operated in connection with the water bottling business. The two parcels are improved by the

following structures:

    a.  78,691 sq./ft. water bottling production facility
    b.  72,000 sq./ft. warehouse building
    c.  62,124 sq./ft. warehouse building
    d.  20,869 sq./ft. two-story barn
    e.  6,840 sq./ft. vehicle repair shop
    f.  1,680 sq./ft. machine shop
    g.  1,411 sq./ft. two-story office building
    h.  3,024 sq./ft. 2 bedroom home/office
    i.  920 sq./ft. manufactured home/trailer building

24.    As discussed more fully below, the Real Property is encumbered by four (4)

mortgage liens in the following positions and approximate outstanding principal amounts:

| Position | Mortgagee (defined below) | Amount of Claim[8] |
|---|---|---|
| First | NBT | $3,452,538.66 |
| Second | ESCDC/SBA | $3,617,276.78 |
| Third | NEB/USDA[9] | $9,389,912.79 |
| Fourth | SZCC | $ 287,167.60 |

---

[8] The secured claims may also include accrued and unpaid interest, fees and expenses, including reasonable attorneys' fees.
[9] As successor by assignment from the FDIC as Receiver for Tennessee Commerce Bank. Upon information and belief, this debt was purchased for a substantial discount.

25.    Millers Wood and Nirvana are also parties to a Payment-In-Lieu-of-Taxes Agreement with the Oneida County Industrial Development Agency ("OCIDA") and a related Lease Agreement dated February 1, 2008, that require Nirvana to make various payments to OCIDA, Oneida County, Adirondack Central School District and Town of Boonville in lieu of paying real property taxes.

26.    Millers Wood's sole asset is the Real Property, which has an orderly liquidation value of $7,310,000.00.  Its only liabilities are the obligations owed to the Prepetition Secured Lenders totaling approximately $27,204,092.28 and outstanding real estate taxes for 2014-2015 totaling approximately $273,256.78.

## THE PREPETITION LENDERS

27.    As of the Petition Date, the Debtors are indebted to secured creditors NBT Bank ("NBT"), the U.S. Small Business Administration, through the Empire State Certified Development Corp. ("ESCDC/SBA"), the New York State Business Development Corporation ("NYBDC"), the Statewide Zone Capital Corporation of New York ("SZCC"), Northeast Bank/United States Department of Agriculture ("NEB/USDA") and Comsource, Inc. ("Comsource") (collectively, the "Prepetition Secured Lenders") in the aggregate principal amount of $27,204,092.28.   With the exception of the security interest held by Comsource (described below), the respective priorities of liens covering the collateral pledged by the Debtors to the Prepetition Secured Lenders are governed by an Intercreditor Agreement executed by the Prepetition Secured Lenders on November 6, 2012.   For ease of reference, a summary of the collateral positions held by the Prepetition Secured Lenders is attached hereto as **Exhibit A**. The Debtors are indebted to the Prepetition Secured Lenders pursuant to the following transactions and documents (collectively, the "Prepetition Loan Documents"):

2493030.2 6/3/2015

a.    On November 6, 2012, the Debtors executed and delivered a Term Loan Promissory Note to Alliance Bank, NBT's predecessor in interest (together with all related transaction documents, the "NBT Loan") pursuant to which Alliance loaned the Debtors the original principal amount of $3,675,000.00.  Repayment of the amount loaned under the NBT Loan is secured by a first position security interest and lien covering the Debtors' general business assets and a first position mortgage lien covering the Real Property (the "NBT Liens"), and is guaranteed by Mansur and Mozafar Rafizadeh.  As of the Petition Date, the Debtors' obligation owed to NBT under the NBT Loan included approximately $3,452,538.66 in unpaid principal, together with accrued interest, expenses and attorneys' fees.

b.    On November 6, 2012, the Debtors executed and delivered an SBA 504 Loan Agreement to the ESCDC (together with all related transaction documents, the "ESCDC Loan") pursuant to which ESCDC loaned the Debtors the original principal amount of $3,748,000.00.  The ESCDC Loan is insured by the SBA.  Repayment of the amount loaned under the ESCDC Loan is secured by a second position security interest and lien covering the Debtors' general business assets and a second position mortgage lien covering the Real Property (the "ESCDC Liens"), and is guaranteed by Mansur and Mozafar Rafizadeh.  As of the Petition Date, the Debtors' obligation owed to ESCDC under the ESCDC Loan included approximately $3,617,276.78 in unpaid principal, together with accrued interest, expenses and attorneys' fees.

c.    On November 6, 2012, the Debtors executed and delivered a Line of Credit Promissory Note to Alliance Bank, NBT's predecessor in interest, (together with all related transaction documents, the "NBT Line of Credit"), pursuant to which Alliance Bank made a line of credit available to the Debtors in the original principal amount of $4,000,000.00.  Repayment of the amounts loaned under the NBT Line of Credit is secured by a first position security interest and lien covering the Debtors' accounts receivable and inventory and a fourth position security interest and lien covering the Debtors' general business assets (the "NBT LOC Liens"), and is guaranteed by Mansur and Mozafar Rafizadeh.  As of the Petition Date, the Debtors' obligation owed to NBT under the NBT Line of Credit included approximately $3,682,211.66 in unpaid principal, together with accrued interest, expenses and attorneys' fees.

d.    On November 6, 2012, the Debtors executed and delivered a Note to the NYBDC (together with all related transaction documents, the "NYBDC Loan"), pursuant to which the NYBDC loaned the Debtors the original principal amount of $2,125,000.00.  Repayment of the amount loaned under the NYBDC Loan is secured by a first position security interest and lien covering certain machinery and equipment known as the "SIPA Bottling Line" (the "NYBDC Lien") and is guaranteed by Mansur and Mozafar

Rafizadeh.  As of the Petition Date, the Debtors' obligation owed to the NYBDC under the NYBDC Loan included approximately $2,000,398.63 in unpaid principal, together with accrued interest, expenses and attorneys' fees.

 e.  On November 6, 2012, the Debtors executed and delivered an Equipment Loan Promissory Note to Alliance Bank, NBT's predecessor in interest (together with all related transaction documents, the "NBT Equipment Loan"), pursuant to which Alliance loaned the Debtors the original principal amount of $1,700,000.00.  Repayment of the amount loaned under the NBT Equipment Loan is secured by a second position security interest and lien covering certain machinery and equipment known as the "SIPA Bottling Line" (the "NBT Equipment Lien") and is guaranteed by Mansur and Mozafar Rafizadeh.  As of the Petition Date, the Debtors' obligation owed to NBT under the NBT Equipment Loan included $1,700,000.00 in unpaid principal, together with accrued interest, expenses and attorneys' fees.

 f.  On August 30, 2012, Nirvana executed and delivered a Mortgage Note and Loan and Security Agreement to the SZCC (together with all related transaction documents, the "SZCC Loan"), pursuant to which the SZCC loaned Nirvana the original principal amount of $300,000.00.  Repayment of the amount loaned under the SZCC Loan is secured by a fifth position security interest and lien covering Nirvana's general business assets, a fourth position security interest and lien covering Nirvana's accounts receivable and inventory, a third position security interest and lien covering Nirvana's SIPA Bottling Line (the "SZCC Lien") and a fourth position mortgage lien covering the Real Property, and was guaranteed by Transport, Warehousing, Miller's Wood, Mansur Rafizadeh and Mozafar Rafizadeh.  As of the Petition Date, the Debtors' obligations owed to SZCC under the SZCC Loan included approximately $287,167.60 in unpaid principal, together with accrued interest, expenses and attorneys' fees.

 g.  On November 23, 2010, the Debtors executed and delivered a Term Loan Promissory Note (together with all related transaction documents, the "NEB/USDA Loan") to NEB/USDA's predecessor in interest, Tennessee Commerce Bank, pursuant to which TCB loaned the Debtors the sum of $10,000,000.00.  The USDA is a participant in the NEB/USDA Loan. Repayment of the amounts loaned under the NEB/USDA Loan is secured by a third position security interest and lien covering the Debtors' general business assets, a second position security interest and lien covering the Debtors' accounts receivable and inventory, a fourth position security interest and lien covering Nirvana's SIPA Bottling Line (collectively, the "NEB/USDA Lien") and a third position mortgage lien covering the Real Property, and was guaranteed by Mansur Rafizadeh and Mozafar Rafizadeh.  As of the Petition Date, the Debtors' obligations owed to NEB/USDA under the NEB/USDA Loan included approximately $9,389,912.79 in unpaid principal, together with accrued interest, expenses and attorneys' fees.

11

h. On January 30, 2012, Nirvana executed and delivered a Master Lease Agreement to Comsource (together with all related transaction documents and amendments, the "Comsource Agreement"), pursuant to which Comsource leases an injection molding machine and blow molding equipment (the "Leased Equipment") to Nirvana. Rental payments under the Comsource Agreement total approximately $67,185.00 per month. Comsource's first position security interest and lien upon the Leased Equipment is evidenced by UCC-1 financing statements duly filed with the New York Secretary of State on January 31, 2012 and February 17, 2012. Repayment of the amounts due under the Comsource Agreement is guaranteed by Mansur and Mozafar Rafizadeh. As of the Petition Date, the Debtors' obligation owed to Comsource under the Comsource Agreement included $3,074,586.16 in unpaid principal, together with accrued interest, expenses and attorneys' fees.

28.    During late 2013, the Debtors defaulted on their obligations under the Prepetition Loan Documents. From January 14, 2014 through the Petition Date, the Debtors have been parties to Forbearance Agreements, as modified from time to time, with NBT, ESCDC/SBA, NYBDC and SZCC concerning their respective obligations.

29.    The purpose of the Forbearance Agreements was to provide the Debtors time to explore all available sale and refinancing options. To that end, on December 18, 2013, the Debtors retained Next Point, LLC ("Next Point") as their financial advisor and business broker to market the water bottling business for sale. Next Point aggressively marketed the Debtors' assets for sale as a going concern. Its representatives prepared offering documents and an electronic data room containing the Debtors' financial and operational information and contacted several hundred potential strategic and financial purchasers. Next Point contacted more than 600 possible purchasers. Other brokers have also presented potential purchasers and financiers to the Debtors. Several parties expressed serious interest in acquiring the Debtors' assets and business operations and submitted non-binding letters of intent to the Debtors. In addition, one prospective purchaser submitted a proposed Asset Purchase Agreement. Extensive due diligence and discussions ensued with each of those parties; however, none of those discussions resulted in

an executed asset purchase agreement or refinancing commitment. The Debtors terminated Next Point on September 9, 2014.

30.    The Forbearance Agreements were amended fifteen (15) times to extend the forbearance periods through April 1, 2015 in order to allow the Debtors to continue their efforts to (i) obtain an equity inventor, (ii) obtain financing to refinance existing obligations and provide sufficient working capital for operations, or (iii) sell the Debtors' businesses and/or assets, as a going concern. Toward that end, since August 2014, with the assistance of Jay Teitelbaum, Esq. of Teitelbaum & Baskin, LLC and Stephen Donato of Bond, Schoeneck & King, PLLC, and with the support of NBT, ESCDC/SBA, NYBDC, SZCC and Comsource, the Debtors identified no fewer than sixteen (16) strategic and financial parties which executed non-disclosure agreements and conducted due diligence. The Debtors also engaged the office of Senator Charles Schumer to assist in negotiations with government creditors, including the SBA, NYBDC, SZCC and NEB/USDA.

31.    The Debtors obtained a first letter of intent from a financial investor on or about October 3, 2014 which provided for an out-of-court restructuring and recapitalization of the Debtors (the "First LOI"). The restructuring was conditioned upon, among other things, a consensual restructuring of the claims held by the Prepetition Secured Lenders and their principal unsecured creditors. With one exception, the Prepetition Secured Lenders recognized the issues faced by the Debtors, and the fact that the Debtors were seeking to preserve approximately 77 local jobs, and supported the First LOI. One Prepetition Secured Lender refused to participate in good faith discussions and refused to consider any reasonable compromise on its claim amount. As a result, the Debtors could not meet the requirements of the First LOI and the First LOI was terminated as of December 15, 2014.

2493030.2 6/3/2015

32.     The Prepetition Secured Lenders thereafter increased the pressure on the Debtors to either peacefully surrender the collateral for liquidation.  NBT, ESCDC/SBA, NYBDC, SZCC and Comsource, however, recognized that a forced liquidation was not in the best interests of any party and continued to support the Debtors' efforts to locate an investor or purchaser.  On or around February 26, 2015, the Debtors obtained a second letter of intent from a strategic party (the "Second LOI").  The Second LOI was conditioned upon certain due diligence which was to be completed on or before March 20, 2015 and contemplated an acquisition of all or substantially all of the Debtors' assets as a going concern under § 363 of the Bankruptcy Code.  On March 20, 2015, however, the prospective purchaser advised that it would not proceed with the acquisition and terminated the Second LOI.

33.     In addition, on May 16, 2014, NEB/USDA commenced an action against the Debtors and others in the Supreme Court, County of Oneida seeking to foreclose its deeply subordinated third position mortgage lien covering the Real Property.  On July 1, 2014, NEB filed a motion seeking the appointment of a receiver to manage the Real Property (the "Receiver Motion"), and on August 14, 2014, NEB filed a motion seeking summary judgment relief on its foreclosure complaint (the "Summary Judgment Motion").  On March 5, 2015, the Supreme Court (Clark, J.) issued a Decision, Order and Judgment granting the Receiver Motion and appointing Carl S. Dziekan, Esq. as receiver.  The order defining the scope of the receiver's duties has not yet been issued by the Supreme Court.  On March 9, 2015, the Supreme Court issued a Decision, Order and Judgment granting the Summary Judgment Motion, which was filed with the Oneida County Clerk on March 19, 2015.

2493030.2 6/3/2015

34.     Following the termination of the Second LOI and the continued aggressive position of NEB/USDA, the Debtors, with the support of NBT, ESCDC/SBA, NYBDC, SZCC and Comsource, determined that chapter 11 filings were unavoidable.

35.     Nirvana's net sales have declined from a high of $28,573,342 in 2012 to projected sales of less than $20,000,000.00 for 2015 as a result of Nirvana's cash shortage and inability to pay for resin and other materials needed to manufacture the bottles and packing required to satisfy customer orders and the increased competition from other, larger water bottling companies. As a result, Nirvana has incurred an operating losses in 2012, 2013 and 2014 of -$1,470,826.00, -$3,700,000.00 and -$3,971,964.00, respectively.

36.     As previously noted, since January 2014, the Debtors have explored all available options in an effort to reorganize their financial affairs, including seeking refinancing, new capital contributions and aggressively seeking the sale of their assets as a going concern. The Debtors engaged investment banker Next Point and other business brokerage firms which undertook extensive efforts to market the Debtors' assets and business operations for sale. Although several potential financial and/or strategic purchasers expressed interest in acquiring the Debtors' assets and operations, and conducted extensive due diligence, none of the purchasers submitted a final purchase offer to the Debtor. Nirvana was successful in obtaining an operating capital loan from Fox Hill Realty, LLC[10], an entity I own, during that period; however, notwithstanding the infusion of these funds, Nirvana's revenues continued to decline and significantly impair its ability to operate. During the past year, Nirvana has attempted to restructure its financial situation by reducing expenses and making other operational adjustments, including laying off employees. These adjustments, however, have not alleviated

---

[10] The funds loaned by Fox Hill Realty, LLC to the Debtors were borrowed by Fox Hill from Kevin Hanlon, the president of Comsource.

2493030.2 6/3/2015

the liquidity crisis faced by the Debtors.  Absent chapter 11 relief, Nirvana projects that it will

not have sufficient cash flow to continue its operations past June, 2015.

    37.    These cases are being filed to pursue an expeditious sale of the Debtors'

businesses as going concerns pursuant to § 363 of the Bankruptcy Code.  The Debtors have

prepared a sale motion with a proposed Asset Purchase Agreement and will file the motion on, or

shortly after, the Petition Date seeking to (i) approve bidding procedures and (ii) sell

substantially all of their assets pursuant to § 363 of the Bankruptcy Code.  The Debtors anticipate

that the purchaser will continue to operate the water bottling business at the Forestport facility

and retain many of their employees.  The sale of the Debtors' assets will be subject to higher and

better offers and the approval of this Court.

    38.    The purpose of the Debtors' chapter 11 filings, therefore, is to ensure the ongoing

operations of the water bottling facility, to address the Debtors' financial difficulties for the

benefit of their respective creditors and to market the Debtors for sale through a competitive

bidding process.

## PART II - FIRST DAY MOTIONS

A.    **Application for Order Pursuant to Sections 327(a) of the Bankruptcy Code Authorizing the Retention of Bond, Schoeneck & King, PLLC as Attorneys for the Debtors and Debtors in Possession**

    39.    Rule 6003 of the Federal Rules of Bankruptcy Procedure provides that, "the Court

shall not, within 21 days after the filing of the petition, issue an order granting the following: (a)

an application under Rule 2014 [Employment of Professional Persons]." Fed R. Bankr. P. 6003.

Accordingly, the Debtors are in the process of preparing applications to retain professionals,

which will be submitted to the Office of the United States Trustee shortly after the Petition Date.

The Debtors will propose to retain Bond, Schoeneck & King, PLLC as their general bankruptcy

16

counsel and Teitelbaum & Baskin, LLC, as special counsel to assist with the sale of the Debtors' businesses.

40.    The Debtors have selected the law firm of Bond, Schoeneck & King, PLLC ("Bond") to act as their attorneys in connection with the prosecution of their chapter 11 cases.

41.    Due to Bond's recognized expertise in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code, as well as its specialized and substantial expertise in corporate, litigation, labor and real estate law, I believe that Bond is highly qualified to assist the Debtors with the intricate legal issues likely to arise in these chapter 11 cases.

42.    Prior to the Petition Date, the Debtors consulted with Bond with respect to, among other things, the preparation, commencement and prosecution of these cases.  Through such consultations, Bond has become familiar with the Debtors' businesses and legal affairs. Furthermore, the members and associates of Bond who will advise the Debtors in these cases have considerable knowledge and experience in the field of bankruptcy law and debtors' and creditors' rights, including insolvencies, restructurings and business reorganizations and liquidations under chapter 11 of the Bankruptcy Code, as well as in other areas of law related to these chapter 11 cases.

43.    If retained, Bond will render the following services, without limitation, on the Debtors' behalf:

(a)    advising the Debtors with respect to their powers and duties as debtors and debtors in possession in the continued management and operation of their respective businesses and assets;

(b)    attending meetings and negotiating with representatives of creditors and other parties in interest and advising and consulting on the conduct of the cases, including all of the legal and administrative requirements of operating in chapter 11;

17

(c)     taking all necessary action to protect and preserve the Debtors' estates, including the prosecution of actions commenced under the Bankruptcy Code on their behalf, and objections to claims filed against the estates;

(d)     preparing, on behalf of the Debtors, all motions, applications, answers, orders, reports and papers necessary to the administration of the estates;

(e)     negotiating and preparing, on the Debtors' behalf, chapter 11 plans, disclosure statements and all related agreements and/or documents and taking any necessary action on behalf of the Debtors to obtain confirmation of such plans;

(f)     advising the Debtors with respect to sales of assets;

(g)     appearing before this Court, any appellate courts, and the U.S. Trustee, and protecting the interests of the Debtors' estates before such courts and the U.S. Trustee;

(h)     performing all other legal services in connection with these chapter 11 cases.

44.     Bond has indicated its willingness to act in these cases as the Debtors' attorneys and to render the foregoing services.  The Debtors have agreed to pay Bond compensation on an hourly basis, plus reimbursement of actual and necessary expenses and other charges incurred by Bond.  I believe the fees that Bond will charge the Debtors, as set forth in the Affidavit of Stephen A. Donato, Esq. to be filed in support of Bond's retention application, are fair and reasonable in light of prevailing market rates, both in and out of chapter 11 proceedings, and Bond's extensive experience and the scope of the work to be performed pursuant to this retention.

45.     I believe that Bond is well qualified to represent the Debtors as debtors in possession in these chapter 11 cases and that the retention of BS&K is necessary and in the best interests of the Debtors, their estates and their creditors.  Accordingly, the Debtors respectfully

request that the Court issue an Order approving the appointment of Bond to act as the attorneys to the Debtors herein.

**B.    Application for Order Pursuant to Sections 327(e) of the Bankruptcy Code Authorizing the Retention of Teitelbaum & Baskin LLC as Special Counsel for the Debtors and Debtors in Possession**

46.    In addition to retaining Bond to act as general counsel to the Debtors, the Debtors have selected Teitelbaum & Baskin, LLC located at 1 Barker Avenue, Third Floor, White Plains, New York ("T&B") to act as special counsel in connection with the proposed marketing and sale of their assets, plan issues and handling matters for which Bond may have a conflict, if any. Attorney Jay Teitelbaum of T&B has represented the Debtors in this capacity since late August 2014 and has been actively involved in identifying and negotiating with prospective purchasers since that time.  Mr. Teitelbaum has nearly 30 years' experience in the areas of bankruptcy, restructuring, creditors' rights and commercial litigation, and is an experienced mediator in matters before the Bankruptcy Court for the Southern District of New York.  In addition, having worked with the Debtors and the Prepetition Secured Lenders since August 2014, Mr. Teitelbaum is familiar with the Debtors' businesses and operational issues.

47.    T&B has indicated its willingness to act as special counsel in these cases and to render the foregoing services.  The services will be provided is a manner so as to avoid duplication of the services provided by Bond.  The Debtors have agreed to pay T&B compensation on an hourly basis, plus reimbursement of actual and necessary expenses and other charges incurred by T&B.  I believe the fees that T&B will charge the Debtors, as set forth in the Affidavit of Jay Teitelbaum, Esq. to be filed in support of T&B's retention application, are fair and reasonable in light of prevailing market rates, both in and out of chapter 11 proceedings, and

2493030.2 6/3/2015

T&B's extensive experience and the scope of the work to be performed pursuant to this retention.

48.     I believe that T&B is well qualified to represent the Debtors as special counsel in these chapter 11 cases and that the retention of T&B is necessary and in the best interests of the Debtors, their estates and their creditors.  Accordingly, the Debtors respectfully request that the Court issue an Order approving the appointment of T&B to act as special counsel to the Debtors herein.

**C.    Motion for Order Authorizing (A) Maintenance of Existing Bank Accounts, (B) Continued Use of Existing Cash Management Systems, (C) Continued Use of Existing Business Forms and (D) Authorizing Continued Intercompany Transactions**

49.     A list of the Debtors' respective bank accounts (collectively, the "Bank Accounts") is provided in the Motion of the Debtors for Entry of an Order Authorizing (A) Maintenance of Existing Bank Accounts, (B) Continued Use of Existing Cash Management System, (C) Continued Use of Existing Business Forms and (D) Authorizing Continued Intercompany Transactions dated June 3, 2015 (the "Bank Account Motion").  Nirvana, Transport and Warehousing all maintain separate operating checking accounts at NBT and separate payroll accounts at Adirondack Bank.  In addition, Nirvana maintains a checking account and a NYS Bottle Deposit Account at Adirondack Bank, a NYS Bottle Deposit Account at NBT, a Maine Bottle Deposit Account at NBT, and a Connecticut Bottle Deposit Account at Bank of America (NBT, Adirondack Bank and Bank of America are collectively, the "Banks").  Nirvana also maintains a corporate credit card account with American Express.  Millers Wood does not maintain any bank accounts or credit card accounts.

50.     The Bank Accounts and the Debtors' practices and procedures with respect to the receiving customer payment, collecting deposits, making disbursements and making payroll

constitute the Debtors' cash management systems (the "Cash Management Systems").  The Cash

Management Systems enable the Debtors to monitor collection and disbursement of funds, and

maintain control over the administration of their bank accounts, all of which facilitate the

effective collection, disbursement and movement of cash.

51.    As of the Petition Date, the Debtors will instruct the Banks to stop payment on all

outstanding checks issued to vendors or other trade creditors on account of prepetition debts or

liabilities, with the exception of those checks to employees for wages and/or employee benefits,

as described more fully in the Motion of the Debtors for Entry of an Order Authorizing the

Debtors to (A) Pay Prepetition Compensation and Reimbursable Employee Benefits, (B) Pay and

Honor Employee Medical and Other Benefits and (C) Continue Employee Benefit Programs

dated June 3, 2015 (the "Employee Wage Motion").

52.    Pursuant to the standard chapter 11 operating practice in this jurisdiction, the

Debtors are required, among other things, to open new bank accounts upon the filing of the

bankruptcy petitions and are further required to designate such accounts as "Debtor in

Possession" on the respective account signature cards.

53.    The Debtors' existing Cash Management System is essential to the ordinary

coordination of the Debtors' businesses.  The Debtors submit that the cost and expense of

changing the Bank Accounts and creating a new cash management system would not only force

the Debtors to incur significant and unnecessary costs and expenses, but would impair the

operation of the Debtors' businesses.

54.    Indeed, forcing the Debtors to employ new cash management systems could cause

confusion, diminish the prospects for a successful reorganization, disrupt payroll and introduce

inefficiency at a time when efficiency is most critical, and place a strain on the Debtors'

2493030.2 6/3/2015

relationships with customers and vendors.  Naturally, these relationships must be maintained if the Debtors are to be given the opportunity to operate successfully.  Asking the Debtors' various commercial and government customers to remit payments to new and different accounts will result in a slowdown in the Debtors' collection of receipts just at the time when prompt collection of much-needed cash is most critical.

55.     Further, the preservation of the Bank Accounts will not adversely impact any of the Debtors' creditors.  The Debtors will work with the Office of the United States Trustee to ensure that the Bank at which the Debtor's operating, payroll and credit card accounts are located are designated as Authorized Depositories.

56.     The Debtors seek to prohibit and enjoin the Banks from honoring all prepetition checks, except as expressly set forth herein.  As noted above, and in the Employee Wage Motion, filed contemporaneously herewith, the Debtors request that the Court direct the Banks to continue honoring payroll checks (to the extent sufficient funds are on deposit to honor such checks) without regard to when such payroll checks were issued.  Such relief is necessary to implement, to the extent granted, and shall be subject to, the relief requested by the Debtors in the Employee Wage Motion.  The Debtors intend to provide notice of entry of the order granting the Bank Account Motion to the Banks within one (1) business day of the entry of such an order.

57.     The Debtors also request permission to use their existing business forms and stationery without alteration or change.  The Debtors do not print their own business forms and stationery.  Thus, substantial time and expense would be required if the Debtors were required to print new business forms and stationery merely to indicate "debtor in possession".  The Debtors also intend to execute new signature cards with respect to its Bank Accounts to indicate "debtor in possession", and will also stamp all checks "DIP" or "Debtor in Possession" postpetition.

2493030.2 6/3/2015

58.    Finally, in the ordinary course of their businesses, the Debtors utilize a cost allocation system by which relevant expenses are allocated between Nirvana and Transport and Warehousing (the "Intercompany Transactions"). As a result of the Intercompany Transactions, intercompany receivables and payables are created in the ordinary course of business (the "Intercompany Claims").[11] The Intercompany Transactions are sometimes settled by book entry rather than by an actual transfer of cash. Nirvana, Transport and Warehousing track all Intercompany Transactions in their respective accounting systems and can ascertain, trace and account for them as needed. Continuing these Intercompany Transactions and other intercompany services will benefit the Debtors' estates. If the Intercompany Transactions were to be discontinued, the Cash Management Systems and related administrative controls would be disrupted to the detriment of Nirvana, Transport and Warehousing.

59.    Based upon all of the foregoing, the Debtors submit that sufficient cause exists to allow the Debtors to maintain their existing Bank Accounts, Cash Management Systems and business forms, and to continue to effect Intercompany Transactions, and respectfully requests that they be authorized to continue using their current Cash Management Systems and business forms during the post-petition period.

**D.    Motion for Entry of an Order Authorizing the Debtors to (A) Pay Prepetition Compensation and Reimbursable Employee Benefits, (B) Pay and Honor Employee Medical and Other Benefits and (C) Continue Employee Benefit Programs**

60.    To avoid the significant risks of resignations and of discontent or loss of morale among essential employees, and in view of the priority awarded to wage claims, it is necessary

---

[11] Nirvana, Transport and Warehousing engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises similar to Nirvana. The Intercompany Transactions are ordinary course transactions within the meaning of § 363(c)(1) of the Bankruptcy Code. Nonetheless, out of an abundance of caution, the companies seek express authority to engage in such transactions on a post-petition basis. The continued performance of the ordinary course Intercompany Transactions is integral to ensuring the companies' ability to operate their businesses as debtors in possession.

2493030.2 6/3/2015

and appropriate that the Debtors be granted authorization requested in the Employee Wage Motion. The Debtors require the continued service of their employees in order to ensure that the continuity and quality of its business operations will not be threatened and so that the Debtors may continue, without unnecessary interruption, their efforts to achieve successful outcomes for the chapter 11 cases.

61.    Nirvana currently employs 55 full-time employees and no part-time employees. Thirteen (13) are salaried employees and 42 are hourly employees.  There are no union employees.  Nirvana also employs seven (7) independent sales contractors that work on a commission basis.  All of the employees are paid weekly, in arrears, on Thursday.  The average weekly gross payroll for the Nirvana employees is approximately $40,300.00 and sales commissions to the independent contractors total between $4,500.00 and $10,000.00 monthly, depending upon sales.  The payments to the independent contractors are treated as regular trade payables.  As discussed in Section II(C) above, Nirvana maintains a payroll account at Adirondack Bank.

62.    Transport currently employs three (3) full-time employees and no part-time employees.  Two (2) employees are salaried and one (1) is hourly.  There are no union employees.  All of the employees are paid weekly, in arrears, on Thursday, and the average weekly gross payroll is approximately $3,000.00.  As discussed in Section II(C) above, Transport maintains a payroll account at Adirondack Bank.

63.    Warehousing currently employs fourteen (14) full-time, hourly employees and no part-time employees.  All of the employees are non-union.  All of the employees are paid weekly, in arrears, on Thursday, and the average weekly gross payroll is approximately $6,800.00.  As discussed in Section II(C) above, Warehousing maintains a payroll account at

2493030.2 6/3/2015

Adirondack Bank.  Millers Wood has no employees.  The Nirvana, Transport and Warehousing employees are hereafter, collectively, the "Employees".

64.    As of the Petition Date, the accrued, unpaid payroll for all Employees was approximately $50,100.00.  The next regularly-scheduled pay date for all Employees is June 4, 2015.  All of the wages to be paid to the Employees on June 4 accrued during the period of May 25-31, 2015 and constitute prepetition wages.  Therefore, it is imperative that the Debtors obtain authorization to pay priority prepetition wage claims to all of their Employees on or before June 4, 2015.

65.    No Employee is currently owed amounts that exceed the $12,475.00 cap on priority claim amounts set forth in § 507(a)(4) of the Bankruptcy Code.

66.    Accordingly, the Employee Wage Motion seeks authority to pay accrued but unpaid prepetition wages, salaries and commissions due all Employees through the Petition Date.  The Debtors seek to pay the wages, salaries and commissions for all Employees in the ordinary course when the first obligations come due on June 4, 2015, including obligations that are not yet due.

67.    In addition, in the ordinary course of their businesses, the Debtors provide benefits to their Employees (collectively, the "Employee Benefits").  The Employee Benefits to Employees include, without limitation, vacation leave, health insurance, dental insurance, life insurance, workers' compensation and disability insurance.

68.    The accrued pre-petition payroll and Employee Benefits owed is less than $12,475.00 for each Employee in all circumstances.

69.    The Debtors further request that this Court authorize the Banks to process, honor and pay all prepetition checks issued by, and fund transfer requests made from, the Debtors with

respect to Employee wages, salaries, commissions and Employee Benefits that were not processed, honored or paid as of the Petition Date.

70.     Finally, the Debtors routinely withhold from Employee paychecks amounts that the Debtors are required to transmit to third parties.  Examples of such withholding include Social Security, FICA, federal, state, and local income taxes, garnishments and premiums for health care, dental and life insurance payments.  Such withheld funds, to the extent that they remain in the Debtors' possession, constitute monies held in trust and, therefore, are not property of the Debtors' bankruptcy estates.  I respectfully submit that the Debtors' practice of directing such funds to the appropriate parties is in the ordinary course of business, and the Debtors are seeking authority to continue such practice.

71.     The obligations for which the Debtors seek authorization to honor to their Employees were earned by individuals employed by the Debtors, and are for services rendered within one hundred and eighty (180) days before the commencement of the Debtors' cases.  The obligations are for wages and payroll taxes based on such wages, and for the other Employee Benefits mentioned above.

72.     The relief requested pursuant to the Employee Wage Motion will not prejudice creditors, but rather will protect their interests.

**E.     The Debtors' Emergency Application and Order (1) Authorizing Limited Use of Collateral, Including Cash Collateral, and Providing Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363, and (2) Scheduling Interim and Final Hearings Concerning Use of Cash Collateral**

73.     The Debtors respectfully request that the Court enter an Emergency Order (a) authorizing limited use of assets subject to the liens of its Prepetition Secured Lenders, including, but not limited to, cash collateral (the "Cash Collateral") pursuant to § 363 of the Bankruptcy Code, (b) authorizing the Debtor to grant adequate protection to the Prepetition

2493030.2 6/3/2015

Secured Lenders pursuant to §§ 361 and 363 of the Bankruptcy Code, and (c) scheduling an interim hearing and a final hearing concerning a stipulation among the Debtors, NBT, ESCDC/SBA, NYBDC, SZCC and NEB/USDA pursuant to Bankruptcy Rule 4001 (the "Collateral Stipulation"). The Debtors seek to use the Cash Collateral of these Prepetition Secured Lenders, whose perfected security interests and liens cover substantially all of the Debtors' assets, including accounts receivable and cash (the "Prepetition Collateral") in accordance with the transactions more fully described in paragraph 27 above.

74.    It is my belief that the Debtors require the use of the Cash Collateral to fund their day-to-day operations. Indeed, absent such relief, the Debtors' businesses will be brought to an immediate halt, with disastrous consequences for the Debtors, their estates and creditors. Accordingly, the Debtors seek authority, pursuant to § 363(c)(2) of the Bankruptcy Code, to use the Collateral in the operation of their businesses and administration of their chapter 11 cases. The Debtors have not been able to obtain, in the ordinary course of their business, unsecured credit under § 503(b)(1) of the Bankruptcy Code as an administrative expense sufficient to meet their operating needs.

75.    In order to adequately protect the Prepetition Secured Lenders' interests in the Collateral, the Debtors propose to grant the Prepetition Secured Lenders rollover liens in the Collateral (subject to the Carve-Out defined below) in accordance with the applicable provisions of the Prepetition Loan Documents and in accordance with their relative priority. The Debtors do not have sufficient liquidity to pay both their vendors for the materials necessary to continue operations and make adequate protection payments to the Prepetition Secured Lenders.

76.    The Debtors have received consent from NBT, ESCDC/SBA, NYBDC and SZCC regarding the form of the Emergency Order: (A) Authorizing the Debtors' Cash Collateral, (B)

2493030.2 6/3/2015

Granting Adequate Protection Pursuant to §§ 105, 361 and 363 of the Bankruptcy Code, and (C) Scheduling Interim and Final Hearings for Approval of the Debtors' Continued Use of Cash Collateral (the "Collateral Stipulation") submitted to the Court with the Emergency Application.

77.    In connection with the Collateral Stipulation, NBT, ESCDC/SBA, NYBDC and SZCC have agreed to a carve-out from the asset sale proceeds in the amount of $200,000.00 for payment of administrative expense claims incurred by the Debtors' professionals in these cases (the "Carve-Out"). An additional carve-out is provided for the quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6).

78.    In sum, without immediate access to the Cash Collateral, the Debtors face a liquidity crisis that would threaten the viability of their businesses. If cash is not available to maintain business-as-usual operations during the critical period immediately following commencement of these cases, the Debtors will likely face a substantial, if not devastating, loss of customer support and other irreparable harm from a severe tightening or elimination of trade credit, delayed deliveries, loss of Employees and employee morale and deteriorating relationships with suppliers and customers – all of which would adversely affect the value of the Debtors' businesses. Thus, the Debtors' ability to remain viable operating entities and preserve value pending the orderly liquidations of their estates, depends upon obtaining the interim and final relief requested in the Cash Collateral Stipulation.

F.    **Motion of the Debtors for Entry of an Order Authorizing the Debtors to Pay Prepetition Taxes and Regulatory Fees**

79.    I have reviewed the Motion of the Debtors for Entry of an Order Authorizing the Debtors to Pay Prepetition Taxes and Regulatory Fees (the "Tax Motion"). Based upon my review of the Tax Motion, I understand that the Debtors seek an Order from the Court authorizing, but not directing, them to pay prepetition sales, payroll, trust fund and other taxes

and federal, state and local regulatory fees and licensing fees (collectively, "Taxes and Fees") to the respective authorities in the ordinary course of the Debtors' businesses. Nothing contained in the Tax Motion, however, would preclude the Debtors from contesting, in their sole discretion, the validity and amount of any prepetition Taxes or Fees under bankruptcy or non-bankruptcy law.

80.    For the avoidance of doubt, the Debtors owe the States of New York, Connecticut and Maine the aggregate amount of $2,333,014.73 in connection with bottle deposit fees. The Debtors do not have sufficient funds to pay the fees. While the Debtors continue to investigate the legal and factual issues related to the bottle deposit fees, at this time, the Debtors are informed and believe that the fees are not represented by any trust fund and do not represent a priority claim against the Debtors. As such, the Debtors do not propose to pay such pre-petition fees at this time.

81.    The Debtors, in the ordinary course of their businesses, incur various tax liabilities, including Taxes and Fees. The Taxes and Fees are paid to various taxing authorities (collectively, the "Taxing Authorities") on a periodic basis that is established for each particular tax.

82.    As of the Petition Date, the Debtors believe that they are generally current with respect to the payment of Taxes except (i) certain real property taxes owed by Millers Wood to the County of Oneida for 2014 and 2015 and to the Adirondack Central School District for 2015, and (ii) those Taxes that may have accrued prepetition but are not yet due for payment.

83.    I am informed that the Debtors generally do not have any legal or equitable interest in funds held to pay Taxes and Fees. Moreover, to the extent that these "trust fund" taxes and other amounts are collected from third parties and held for payment to the Taxing

2493030.2 6/3/2015

Authorities, I am informed that they are not property of the estate. The Debtors, therefore, generally have no equitable interest in funds collected and segregated to pay the Sales and Use Taxes.

84.    Prior to the Petition Date, the Debtors paid the Taxes and Fees as they became due to Taxing Authorities. Nothing contained in the Tax Motion should be construed as impairing, or should be deemed to impair, the Debtors' right to contest the validity or amount of any Taxes and Fees that may be alleged to be due; and the Debtors expressly reserve all of their rights with respect thereto.

85.    Further, I am informed that most, if not all, of the Taxes and Fees are entitled to priority status under the Bankruptcy Code. The Debtors' payment of the Taxes and Fees in the ordinary course of business, in all likelihood, will only affect the timing of the payments and not the amounts to be received by such entities. Therefore, I do not believe that other creditors and parties in interest will be prejudiced by such payment.

86.    Without question, I believe that the payment of the Taxes and Fees is necessary to avoid interruption of the Debtors' respective business activities. The withholding of the payment of the Taxes and Fees likely would cause taxing and other authorities to conduct audits and other administrative proceedings, resulting in significant administrative burdens. Prompt and regular payment of the Taxes and Fees will avoid these unnecessary government actions.

87.    Furthermore, authority to pay the Taxes and Fees is necessary to avoid subjecting the Debtors' officers and directors to lawsuits during the pendency of this proceeding that would distract from the effort to successfully conclude a sale of the Debtors' assets. Many federal and state statutes provide that various Taxes and Fees constitute "trust fund" taxes for which officers and directors of the collecting entity may in certain circumstances be held personally liable. To

2493030.2 6/3/2015

the extent any accrued Taxes and Fees were unpaid as of the Petition Date, the taxing and other authorities in such jurisdictions may attempt to enforce such personal liability provisions against certain of the Debtors' officers and directors. Such potential actions would prove extremely distracting for the Debtors, and for the named officers and directors whose immediate and full-time attention to the Debtors' operations is required. I believe it is in the best interests of the Debtors' estates to eliminate the possibility of such time-consuming and potentially damaging distractions.

88.     I believe that granting the relief requested will enhance the likelihood of the successful liquidation of the Debtors and the probability of maximizing the value of estate assets and, ultimately, the return to creditors. Further, I believe that the timely payment of the Taxes and Fees is necessary, is in the best interests of the Debtors' estates and is highly beneficial to the operation of the Debtors' businesses. Accordingly, the Debtors seek authority to pay, in their sole discretion, the Taxes and Fees to the relevant Taxing Authorities in the ordinary course of business.

**G.**     **Motion for Order Authorizing (I) Continuation of Debtors' (A) Workers' Compensation Insurance, (B) Commercial Property and Automobile Insurance and (C) Liability Insurance, and (II) Payment of Prepetition Obligations in Respect Thereof**

89.     I have reviewed the Motion for Order Authorizing (I) Continuation of Debtors' (A) Workers' Compensation Insurance, (B) Commercial Property and Automobile Insurance and (C) Liability Insurance, and (II) Payment of Prepetition Obligations in Respect Thereof (the "Insurance Motion"). I believe that, if the requested relief is not granted and the Insurance Programs (discussed below) lapse or terminate, the Debtors will be unable to continue their business operations, thereby endangering the Debtors' orderly liquidation and substantially harming all creditors.

31

90.    In the ordinary course of the Debtors' businesses, they maintain various liability, property and other insurance (the "Insurance Programs") through several private insurance carriers (the "Insurance Carriers").  The Insurance Programs include coverage for, among other things, workers' compensation claims, personal injury, general liability, property damage and fire, operation of vehicles, breach of officers' and directors' duties and various other property-related and general liabilities.  All of the Insurance Programs referenced above are discussed more fully in the Insurance Motion and are essential to the ongoing operation of the Debtors' businesses.

91.    The premiums for most of the Insurance Programs (the "Insurance Premiums") are determined annually and are paid by the Debtors at policy inception or via installments through the policy term directly to the Insurance Carriers.  The annual Insurance Premiums under the Insurance Programs for all four Debtors aggregate approximately $479,030.00.  As of the Petition Date, all Insurance Premiums are current.  The next (and final) monthly premiums under the workers' compensation policy, commercial general liability policy and automobile policy are due during July 2015.  Those policies are scheduled to renew in September 2015.

92.    Pursuant to the Insurance Programs, the Debtors may be required to pay various deductibles or retention amounts (the "Insurance Deductibles") depending upon the type of claim and insurance policy involved.  Under certain policies, the Insurance Carriers may pay claimants and then invoice the Debtors for any Insurance Deductible.  In such situations, the Insurance Carriers may have prepetition claims against the Debtors.  As of the Petition Date, the Debtors do not believe there are any material prepetition obligations owed to Insurance Carriers relating to Insurance Deductibles but, out of an abundance of caution, the Debtors seek authority to satisfy any such prepetition obligations.

2493030.2 6/3/2015

93.    The natures of the Debtors' businesses and the extent of their operations make it essential for the Debtors to maintain their Insurance Programs on an ongoing and uninterrupted basis.   The non-payment of any premiums, deductibles or related fees under the Insurance Programs could result in one or more of the Insurance Carriers terminating or declining to renew their insurance policies or refusing to enter into new insurance policies with the Debtors in the future.   If the Insurance Programs lapse without renewal, the Debtors could be exposed to substantial liability for personal and/or property damages, to the detriment of all parties in interest.

94.    In order for the Debtors to maintain their operations in compliance with various legal and contractual obligations, the Debtors must be able to continue their Insurance Programs without disruption.   In addition, as directed by the Office of the United States Trustee for the Northern District of New York, debtors in chapter 11 cases have a fiduciary obligation and a legal duty to account for their operations of a business, which in part is met "substantially" by "obtaining and maintaining insurance" following the Petition Date.   The continuation of the Insurance Programs and the payment of all prepetition and post-petition Insurance Obligations arising under the Insurance Programs are therefore essential to preserve the Debtors' businesses and preserve the value of the Debtors' estates for all creditors.   I therefore respectfully request that the Court grant the relief requested in the Insurance Motion in its entirety.

[Signature Page Follows]

2493030.2 6/3/2015

I swear, under penalty of perjury under the laws of the United States of America, that the
foregoing is true and correct to the best of my knowledge, information and belief.


_____
Mozafar Rafizadeh

Sworn to before me this
2nd day of June, 2015.

_____
Notary Public

TIMOTHY D. GURAL
Notary Public, State of New York
Qualified in Onondaga Co. No. 4984147
My Commission Expires July 5, 2016

34

## EXHIBIT A

**Secured Claims – Based on Inter-Creditor Agreement (principal as of 5/31/15):**

Real Estate:

| | |
|---|---|
| 1st lien – NBT = | $3,452,538.66 |
| 2nd lien – ESCDC/SBA = | $3,617,276.78 |
| 3rd lien – NEB/USDA = | $9,389,912.79 |
| 4th lien – SZCC = | $ 287,167.60 |

General Business Assets:

| | |
|---|---|
| 1st lien – NBT = | $3,452,538.66 (to the extent not paid by real estate lien) |
| 2nd lien – ESCDC/SBA = | $3,617,276.78 (to the extent not paid by real estate lien) |
| 3rd lien – NEB/USDA = | $9,389,912.79 (to the extent not paid by real estate lien) |
| 4th lien – NBT = | $3,682,211.66 (Line of Credit) |
| 5th lien – SZCC = | $ 287,167.60 (to the extent not paid by real estate lien) |

Accounts Receivable and Inventory:

| | |
|---|---|
| 1st lien – NBT = | $3,682,211.66 (Line of Credit) |
| 2nd lien – NEB/USDA = | $9,389,912.79 |
| 3rd lien – ESCDC/SBA = | $3,617,276.78 |
| 4th lien – SZCC = | $ 287,167.60 |

SIPA Bottling Line:

| | |
|---|---|
| 1st lien – NYBDC = | $2,000,398.63 |
| 2nd lien – NBT = | $1,700,000.00 |
| 3rd lien – SZCC = | $ 287,167.60 |
| 4th lien – NEB/USDA = | $9,389,912.79 |

Injection Molding Equipment:

| | |
|---|---|
| 1st lien – Comsource = | $3,074,586.16 |

Total Secured Claims = $27,204,092.28

2493030.2 6/3/2015