Date of Hearing to Approve Bid Procedures: July 7, 2015
Hearing Time: 11:30 a.m.
Hearing Place:  Utica, New York
**Objection Deadline:  June 30, 2015**
Date of Hearing to Approve Sale:  October 20, 2015
Hearing Time: 2:00 p.m.
Hearing Place:  Utica, New York
Objection Deadline:  October 13, 2015

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
_____

In re:

    NIRVANA, INC., *et al.,* [1]

                        Debtors.

Case No. 15-60823
Chapter 11 Case
Main Case
Jointly Administered

_____

### DEBTORS' MOTION FOR ORDERS PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6004: (A) (i) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, SUBJECT TO THE TERMS OF THE ASSET PURCHASE AGREEMENT AND SUBJECT TO HIGHER AND/OR BETTER OFFERS; (ii) AUTHORIZING AND APPROVING FORM OF ASSET PURCHASE AGREEMENT; AND (iii) AUTHORIZING DEBTORS TO CONSUMMATE ALL TRANSACTIONS RELATED TO THE PROPOSED SALE; (B) APPROVING BIDDING PROCEDURES AND OTHER RELATED RELIEF; AND (C) AUTHORIZING DEBTORS TO ASSUME CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND ASSIGN SUCH CONTRACTS AND LEASES TO SUCCESSFUL BIDDER PURSUANT TO 11 U.S.C. §§ 365(a), (b) AND (c) AND BANKRUPTCY RULE 6006(e)(1)

    Debtors Nirvana, Inc. ("Nirvana"), Nirvana Transport, Inc. ("Transport"), Nirvana

Warehousing, Inc. ("Warehousing") and Millers Wood Development Corp. ("Millers Wood"),

debtors and debtors in possession in the captioned chapter 11 cases (collectively, the "Debtors"),

by and through their undersigned counsel hereby move this Court (this "Motion") for entry of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Nirvana, Inc. (5474), Nirvana Transport, Inc. (6503), Nirvana Warehousing, Inc. (2646) and Millers Wood Development Corp. (8040).

Orders pursuant to sections 105, 363 and 365 of title 11 of the United States Code, as amended (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"):  (A) (i) authorizing the sale of substantially all of the Debtors' assets, free and clear of all liens, claims, interests and encumbrances, subject to the terms of an Asset Purchase Agreement, the proposed form of which is attached hereto as **Exhibit A** (the "Purchase Agreement"), and subject to higher and better offers; (ii) authorizing and approving the form of the Purchase Agreement; and (iii) authorizing the Debtors to consummate all transactions related to the proposed sale; (B) approving the Bidding Procedures and granting other relief; and (C) authorizing the Debtors to assume certain executory contracts and unexpired leases and to assign such contracts and leases to the Successful Bidder pursuant to sections 365(a), (b) and (c) of the Bankruptcy Code and Bankruptcy Rule 6006(e)(1).   In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.    The statutory and rule-based predicates for the relief requested herein are sections 105, 363 and 365 of the Bankruptcy Code and Rule 6004 of the Bankruptcy Rules.

## BACKGROUND

5.    On June 3, 2015 (the "Petition Date"), the Debtors filed with the United States Bankruptcy Court for the Northern District of New York (the "Court") separate voluntary petitions for relief under chapter 11 of the Bankruptcy Code commencing the above-captioned chapter 11 cases.

2

6.    The Debtors remain in possession of their respective assets and continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7.    As of the date of this motion, no trustee, examiner or official committee of creditors has been appointed in these cases.

8.    Nirvana is a manufacturer and bottler of spring water that is captured from four[2] natural springs on 1,600 acres of real property located in the foothills of the Adirondack Mountains at Forestport, New York.  The Debtors are four affiliated companies that each plays a specific functional role in the overall bottling operation.  Nirvana is the core business that produces and packages the bottled water.  Transport provides transportation services to Nirvana and other parties.  Warehousing provides storage and warehousing services to Nirvana, and Millers Wood is the real estate holding company that owns the 1,600-acre property.

9.    Nirvana is a closely-held New York corporation with a principal office and place of business located at One Nirvana Plaza, Forestport, New York 13338[3].  Nirvana was formed on June 2, 1995 by brothers Mansur and Mozafar Rafizadeh, who are the chairman and president/chief executive officer, respectively, of the company.  Each brother owns 50% of Nirvana's common stock.  The officers are assisted in the operation of the company by chief financial officer Edward Wiehl and several managers.  Nirvana employs 50 full-time employees at its Forestport location, plus five (5) sales representatives in the downstate New York/New Jersey area, for a total of 55 employees.  All employees are non-union.

---

[2] Additional springs are available for use.
[3] The Debtors' physical address is 12044 State Route 12, Boonville, New York 13309.

2495166.1

10.     The spring water bottled by Nirvana comes to the surface by its own natural force at 42° Fahrenheit year round and is collected and bottled on site. The springs produce approximately 605,000 gallons of water each day. The water is sold in a number of bottle sizes and configurations, all presented under the company's "Nirvana Natural Spring Water" brand. Nirvana sells its spring water to leading supermarket chains, mass merchandisers, convenience store chains and drug store chains directly and through distributors, predominately in the Northeast United States.

11.     From 1995 until 2000, Nirvana operated as a co-packer, bottling its water under contract for other bottling companies by filling water into pre-manufactured plastic bottles which it purchased by the truckload. The bottle costs plus the trucking expense, however, put Nirvana at a competitive disadvantage with its integrated competitors. In 2003, Nirvana acquired a blow molding machine which allowed it to manufacture its own bottles at a lower cost. In 2008, Nirvana undertook a major plant expansion to increase bottling capacity in response to its acquisition of several new customers. From 2003-2010, Nirvana was a leading co-packer for several major national brands, including WalMart, Wegmans, 7-11, Wawa and others while also providing Nirvana-branded product to the marketplace.

12.     In 2009, as competitive pricing pressures eroded the profitability of its co-pack/private label business, Nirvana elected to emphasize its own branded product and began building its own distribution network. By the end of 2010, sales rose to 9.4 million cases annually and increased to over 11 million cases in 2011. Nirvana's main competitors in the Northeast market are Nestle Waters North America (Poland Spring, Deer Park Arrowhead), Pepsico (Aquafina) and Coca-Cola (Dasani).

2495166.1

13.    As volume grew in 2011, however, Nirvana experienced a significant capacity issue, which it sought to address by undertaking a $12 million expansion project that would add over 8 million cases of capacity to the bottling operation.  Financing was arranged through the Tennessee Commerce Bank ("TCB") and equipment was scheduled for installation in early 2012.  Unfortunately, the subsequent failure of TCB and its take-over by the Federal Deposit Insurance Corporation (the "FDIC") delayed the project by 18-24 months.  This delay, and the consequent capacity constraints, caused Nirvana to transition to its branded product more rapidly than was planned, and was instrumental in Nirvana both sacrificing private label sales and missing out on sale opportunities during both 2012 and 2013.

14.    By the end of 2011, Nirvana had essentially completed the transition from the co-pack/private label business to the more valuable Nirvana branded water business.  The expansion project was finally completed in August 2013.   Although the company was successful in establishing its branded product in the Northeast, the effort was costly, as slotting fees, promotional support agreements, prepaid advertising and distributor charge-backs eroded profitability.  This decline in profits and available cash flow have resulted in Nirvana being unable maintain its operations while servicing the obligations due its lenders.

15.    Nirvana's assets include non-insider accounts receivable totaling approximately $1,809,949.37, machinery and equipment valued at approximately $6,757,275.00, inventory valued at approximately $1,365,022.96, vehicles valued at $103,500 and intellectual property with an unknown value.  Its liabilities include $27,204,092.28 owed to the Prepetition Secured

2495166.1

Lenders (defined below), priority unsecured claims totaling $2,336,389.73[4], and non-insider general unsecured claims totaling approximately $3,880,855.66[5].

16.    Transport is a closely-held New York corporation with a principal office and place of business located at One Nirvana Plaza, Forestport, New York 13338.  Transport  was formed on October 12, 2004 by Mozafar Rafizadeh, who is the president and sole shareholder of the company.  Transport provided trucking services for Nirvana and other entities, but ceased operating immediately following the Petition Date.  Transport's assets include cash totaling approximately $11,000.00, security deposits totaling $100,000.00, accounts receivable totaling $80,825.25[6] and vehicles and equipment valued at $103,500.00.    Its liabilities include the obligations owed to the Secured Lenders and unsecured non-insider accounts payable totaling $1,202,954.77.

17.    Warehousing is a closely-held New York corporation with a principal office and place of business located at One Nirvana Plaza, Forestport, New York 13338.  Warehousing was formed on March 30, 2007 by Mozafar Rafizadeh, who is the president and sole shareholder of the company.  Warehousing provides storage operations for the millions of cases of bottled water that are produced by Nirvana.  It operates out of two buildings at the Forestport property totaling approximately 135,000 square feet and employs 14 full-time non-union employees. Warehousing's sole asset is the cash in its payroll and operating accounts totaling $10,669.28. Warehousing has no assets other than its payroll account, and its liabilities include the

---

[4] Of this amount, amounts aggregating $2,333,014.73 are owed as bottle deposits to the New York State, Connecticut and Maine taxing authorities.

[5] Of this amount, approximately $1,112,151.12 is owed to bottle recycler TOMRA.

[6] Transport also owns a net inter-company receivable due from Nirvana totaling $795,365.51.

2495166.1

obligations owed to the Prepetition Secured Lenders and the accrued wages and benefits owed to its employees in the ordinary course of business.

18.     Millers Wood is a closely-held New York corporation with a principal office and place of business located at One Nirvana Plaza, Forestport, New York 13338.  It was formed on March 27, 1992 by Mansur Rafizadeh, who is the president and sole shareholder of the company. Millers Wood is the owner of five (5) parcels of real property aggregating approximately 1,679.15 acres located in Forestport, Town of Boonville, County of Oneida, State of New York, covering approximately one mile square, bordered on the west by State Route 12 and on the east by the Black River (the "Real Property").  Two of the five parcels are adjacent to each other and are improved by a house and various commercial structures that are occupied by Nirvana, Transport and Warehousing and operated in connection with the water bottling business.

19.     Two of the five parcels are adjacent to each other and are improved by the house and various commercial structures that are occupied by Nirvana, Transport and Warehousing and operated in connection with the water bottling business.  The two parcels are improved by the following structures:

> a.  78,691 sq./ft. water bottling production facility
> b.  72,000 sq./ft. warehouse building
> c.  62,124 sq./ft. warehouse building
> d.  20,869 sq./ft. two-story barn
> e.  6,840 sq./ft. vehicle repair shop
> f.  1,680 sq./ft. machine shop
> g.  1,411 sq./ft. two-story office building
> h.  3,024 sq./ft. 2 bedroom home/office
> i.  920 sq./ft. manufactured home/trailer building

20.     As of the Petition Date, the Debtors are indebted to prepetition secured lenders (i) NBT Bank ("NBT"), (ii) United States Small Business Administration ("SBA") through the Empire State Certified Development Corporation ("ESCDC"), (iii) New York Business

2495166.1

Development Corporation ("NYBDC"), (iv) Statewide Zone Capital Corporation of New York

("SZCC"), (v) Northeast Bank ("NEB") and (vi) Comsource, Inc. ("Comsource") (NBT, SBA,

ESCDC, NYBDC, SZCC, NEB and Comsource are, collectively, the "<u>Prepetition Secured</u>

<u>Lenders</u>").   The Debtors are indebted to the Prepetition Secured Lenders in the following

principal amounts and repayment of those amounts is secured in the following priorities in the

Debtors' assets:

| <u>Lender</u> | <u>Amount</u> | <u>Collateral</u> |
|---|---|---|
| NBT | $ 3,452,538.66 | Real estate and general business assets |
| ESCDC/SBA | $ 3,617,276.78 | Real estate and general business assets |
| NEB | $ 9,389,912.79 | Real estate, general business assets, accounts receivable, inventory and SIPA bottling line |
| SZCC | $ 287,167.60 | Real estate, general business assets, accounts receivable, inventory and SIPA bottling line |
| NBT | $ 3,682,211.66 | Accounts receivable and inventory |
| NYBDC | $ 2,000,398.63 | SIPA bottling line |
| NBT | $ 1,700,000.00 | SIPA bottling line |
| Comsource | <u>$ 3,074,586.16</u> | Injection molding equipment (leases) |
| Total: | $27,204,092.28 | |

As noted, repayment of these obligations is secured by liens covering substantially all of the

Debtors' real and personal property (the "<u>Assets</u>"), which Assets have an estimated aggregate

value of approximately $20,000,000.00.

21.     Nirvana's net sales have declined from a high of $28,573,342 in 2012 to projected

sales of less than $20,000,000.00 for 2015 as a result of Nirvana's cash shortage and inability to

pay for resin and other materials needed to manufacture the bottles and packing required to

satisfy customer orders and the increased competition from other, larger water bottling

companies.  As a result, Nirvana has incurred an operating losses in 2012, 2013 and 2014 of -

$1,470,826.00, -$3,700,000.00 and -$3,971,964.00, respectively.

2495166.1

22.    Since January 2014, the Debtors have explored all available options in an effort to reorganize their financial affairs, including seeking refinancing, new capital contributions and the sale of their assets as a going concern.  The Debtors engaged Next Point, LLC and other business brokerage firms which undertook extensive efforts to market the Debtors' assets and business operations for sale.  Although several potential financial and/or strategic purchasers expressed interest in acquiring the Debtors' assets and operations, and conducted extensive due diligence, none of the purchasers submitted a viable purchase offer to the Debtor.  Nirvana was successful in obtaining an operating capital loan from Fox Hill Realty, LLC[7], an entity owned by Mozafar Rafizadeh, during that period; however, notwithstanding the infusion of these funds, Nirvana's revenues continued to decline and significantly impair its ability to operate.  During the past year, Nirvana has attempted to restructure its financial situation by reducing expenses and making other operational adjustments, including laying off employees.  These adjustments, however, have not produced the required amount of relief.

23.    In an effort to ensure the continued operation of Nirvana's water bottling facility, the retention of approximately 75 jobs and the fulfillment of its obligations to customers, the Debtors propose to sell substantially all of their assets (the "Asset Sale"), free and clear of all liens, claims, interests and encumbrances, pursuant to the terms of the Purchase Agreement.  The proposed Asset Sale will be subject to highest and best offer and the approval of the Court, and will include the assumption and assignment of executory contracts and unexpired leases to be selected by the Successful Bidder, pursuant to section 365(b)(1) of the Bankruptcy Code.

---

[7] The funds loaned by Fox Hill Realty, LLC to the Debtors were borrowed by Fox Hill from Kevin Hanlon, the president of Comsource.

2495166.1

## **RELIEF REQUESTED**

24.     By this Motion, the Debtors seek the entry by this Court of two (2) orders:

(a)     first, an order (the "Bidding Procedures Order"), a proposed form of which is attached hereto as **Exhibit B**:

   i.     providing a process for interested bidders to submit offers with respect to the Assets;

   ii.    approving the form and manner of notice of this Motion and the relief requested herein;

   iii.   setting a deadline and approving requirements and procedures for interested parties to submit any competing bids for the Assets (the "Bidding Procedures");

   iv.    approving the form of the Purchase Agreement;

   v.     authorizing an auction sale of the Assets; and

   vi.    setting a final hearing date (the "Sale Hearing") to approve the sale of the Assets to the bidder (the "Successful Bidder") submitting the highest or otherwise best offer (the "Successful Bid") acceptable to the Debtors.

(b)     second, the Debtors request the entry of an order (the "Sale Order"):

   i.     authorizing and approving the Successful Bid on substantially the terms and conditions set forth in the Purchase Agreement, or such other terms and conditions as may be acceptable to the Debtors;

   ii.    authorizing the sale of the Assets to the Successful Bidder;

   iii.   authorizing the Debtors to consummate the sale of the Assets to the Successful Bidder; and

   iv.    authorizing the Debtors to assume certain identified executory contracts and unexpired leases and to assign such contracts and leases to the Successful Bidder.

2495166.1

## THE PROPOSED SALE OF THE DEBTORS' ASSETS

25.      As noted above, over the past several years, Nirvana has sustained significant operating losses, and since early 2014, the Debtors have been aggressively marketing their business operations and the Assets for sale to prospective third-party purchasers.

26.      The Debtors have determined that it is in the best interests of their estates, their creditors, their employees and other parties in interest to sell the Assets.   The Debtors' management believes that the approval of the sale is critical to preserving their value for the benefit of all creditors and employees, and it is necessary to provide Nirvana's customers assurance that their contracts will be honored.

A.      **The Purchase Agreement**

27.      The Debtors have prepared a form Purchase Agreement which contemplates the sale of the Assets in a single integrated transaction.   The Debtors anticipate that the parties bidding on the Assets (the "Prospective Purchasers") will use the form of Purchase Agreement approved by this Court, as modified to reflect the Prospective Purchaser's offer.   The salient terms of the form Purchase Agreement are as follows:[8]

> (a)      The Parties.  The Debtors as "Sellers" and the Prospective Purchaser as "Buyer".
>
> (b)      The Assets.   The Assets offered for sale pursuant to the Purchase Agreement are listed in the Schedules "A" and "B" filed by the Debtors on the Petition Date, and comprise substantially all of the real and personal property owned by the Debtors.
>
> (c)      Purchase Price.  To be determined by the Prospective Purchaser.

---

[8] The following description of the terms of the Purchase Agreement is intended solely to provide the Court and interested parties with a brief overview of the terms thereof.  All capitalized terms not otherwise defined herein have the meaning set forth in the Purchase Agreement.

2495166.1

(d)    <u>Conditions</u>.  The proposed sale is subject to several conditions set forth in Article 9 of the Purchase Agreement, including: (i) accuracy of Buyer's and Seller's representations and warranties; (ii) performance of covenants and agreements in the Purchase Agreement; (iii) approval by the Bankruptcy Court; and (iv) receipt of all necessary consents, approvals and permits from third parties necessary to operate the Assets and convey the Assets free and clear of all liens.

(e)    <u>Termination</u>.  The Purchase Agreement terminates under certain circumstances set forth therein, including the following:  (i) by written agreement executed by Seller and Buyer; (ii) by Buyer or Seller, if the Closing does not occur with twenty (20) calendar days of the entry of the Sale Order, unless the parties mutually agree to extend the Closing; or (iii) if there is an uncured breach by Seller or Buyer of its respective warranties or representations under the Purchase Agreement.

(f)    <u>Higher and Better Offers</u>.  As set forth in further detail below, the Asset Sale is subject to the submission by other parties of higher and/or better offers.

## B.    <u>Proposed Bidding Procedures</u>

28.    In an effort to ensure that the highest value is obtained for the Assets, the Debtors propose that the Bidding Procedures, which are intended to maximize the value of the Assets, shall govern the submission of competing bids for the Assets.

29.    The Bidding Procedures are attached hereto as **<u>Exhibit C,</u>** the salient terms of which may be summarized as follows:

(a)    <u>Assets</u>:  The Assets to be sold are substantially all of the Debtors' assets, which are to be sold in a single, integrated transaction.

(b)    <u>Qualified Bid / Qualified Bidders</u>:  In order to ensure that only bidders with serious interest in the purchase of the Assets participate in the bidding process, the Bidding Procedures provide for certain minimal requirements for a potential bidder to become a "<u>Qualified Bidder</u>" and for a bid to purchase the Assets to be a "<u>Qualified Bid</u>", including:

(i)    The execution of a confidentiality agreement;

(ii)    Providing the Debtors with certain financial assurances regarding the bidder's ability to close a transaction;

(iii)    Submission of a Purchase Agreement marked to show changes from the form Purchase Agreement approved by the Court; and

2495166.1

(iv)    Submission of a letter to the Debtors stating that (a) the potential bidder is prepared to enter into and consummate the transactions in accordance with the terms of the marked purchase agreement after the Bankruptcy Court's approval of the Sale Order; (b) the potential bidder will make all necessary federal, state or local filings and pay all fees associated with such filings (including the costs of expenses of the Debtors); and (c) such potential bidder's offer is irrevocable until the date that is twenty (20) days after the conclusion of the Sale Hearing.

(c)    Bid Deadline:  The Bidding Procedures provide for a bid deadline of 4:00 p.m. on October 9, 2015 (the "Bid Deadline").

(d)    Due Diligence:  The Bidding Procedures permit all potential bidders who have signed confidentiality agreements to participate in the due diligence process between June 3, 2015 and October 9, 2015.

(e)    Selection of the Qualified Bids:  As soon as practicable after the Bid Deadline, the Debtors, in consultation with their professionals, shall review each bid submitted and determine which bidders are qualified to participate in the Auction ("Qualified Bidders"), and shall provide notice of same to all persons submitting bids.

(f)    Auction:  If one or more Qualified Bids are received by the Debtors, an Auction shall be held on October 14, 2015 at 10:00 a.m. at the offices of Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York 13202, or such other time and/or other place as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids with respect to the Assets subject to Auction.

At the Auction, Qualified Bidders will be permitted to increase their bids (such increased Qualified Bid, a "Qualified Overbid"), provided that such Qualified Overbid(s) shall exceed the highest existing bid by at least $100,000.00.

The Auction shall not conclude until each Qualified Bidder has had the opportunity to submit thereat a Qualified Overbid with full knowledge of the existing highest bid.

(g)    The Sale Hearing:  The Debtors request that the Court schedule the Sale Hearing for 2:00 p.m. on October 20, 2015.  At the Sale Hearing, the Debtors will seek entry of an order, among other things, authorizing and approving the sale of the Assets to the Successful Bidder, as determined by the Debtors.

Following the Sale Hearing, if the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the next highest or otherwise best Qualified Bid

13

or Qualified Overbid with respect to the Assets as disclosed at the Sale Hearing, shall be deemed to be the Successful Bid with respect to the Assets and the Sellers shall effectuate such sale without further order of the Bankruptcy Court.

(h)    Reservation of Rights:  The Debtors reserve all rights to terminate the sale process at any time if the Debtors determine, in their business judgment and following consultation with their professionals and any committee appointed in this case, that the sale process will not maximize the value of their bankruptcy estates.  In addition, the Debtors reserve all rights not to submit any bid which is not acceptable to the Debtors for approval to the Bankruptcy Court.  Debtors shall further have the right to amend the Bidding Procedures or impose such other terms and conditions with respect to the Bidding Procedures which Debtors determine, in their business judgment, are necessary for Debtors to fulfill their fiduciary duties, provided that such modifications are not inconsistent with any Bankruptcy Court order, including the Bidding Procedures Order.

30.    Similar procedures have been employed successfully in the disposition of assets in other cases.  *See e.g. In re Endicott Interconnect Technologies, Inc.,* Case No. 13-61156 (Bankr. N.D.N.Y. July 10, 2013); *In re Peak Resorts, Inc.,* Case No. 12-31471 (Bankr. N.D.N.Y. February 28, 2013); *In re The Albert Lindley Lee Memorial Hospital,* Case No. 09-30845 (Bankr. N.D.N.Y. April 21, 2009); *In re Northeast Biofuels, LP,* Case No. 09-30057 (Bankr. N.D.N.Y. March 20, 2009); *In re Peters Groceries, Inc.*, Case No. 03-60668 (Bankr. N.D.N.Y. November 15, 2004).

## C.    Assumption and Assignment of Executory Contracts and Unexpired Leases

31.    The Debtors are parties to certain executory contracts and unexpired leases listed on their respective Schedule G filed with on the Petition Date (the "Contracts and Leases"), certain of which will be identified in Schedules 1.1(b) and (c) of the Purchase Agreement to be assumed and assigned to the Successful Bidder.

32.    The Debtors have evaluated each of the Contracts and Leases in the context of the Bankruptcy Code.  In the exercise of their business judgment, and due to the likely desire of the Successful Bidder to continue operating the Debtors' businesses, the Debtors have determined

2495166.1

that the Contracts and Leases are necessary to the proper continued operation of the businesses and their assumption and assignment to the Successful Bidder is beneficial to their estates.

33.    The Debtors, therefore, seek to assume the Contracts and Leases listed on Schedules 1.1(b) and (c) of the Purchase Agreement pursuant to sections 365(a), (b) and (c) of the Bankruptcy Code and assign them to the Successful Bidder pursuant to the terms of such Purchase Agreement.  The Debtors intend to remain current on their obligations due under the Contracts and Leases during the post-petition period until the closing of the sale to the Successful Bidder.

34.    There are various amounts of pre-petition arrears that have accrued in connection with the Contracts and Leases and the Debtors shall address the treatment of the arrears under section 365(b) of the Bankruptcy Code with the affected counter-parties.  The Debtors anticipate that the proposed treatments will be resolved prior to the Sale Hearing and that all of the parties to the Contracts and Leases will consent to the assignment to the Successful Bidder in order to allow the continued operation of the Debtors' businesses.  Attached hereto as **Exhibit D** is a copy of the proposed Notice of Assumption and Assignment to be served upon all counter-parties to the executory contracts and unexpired leases.

35.    This motion complies with Bankruptcy Rule 6006(e)(1) because all of the Contracts and Leases listed on Schedules 1.1(b) and (c) to the Purchase Agreement will be assigned to a single assignee, the Successful Bidder.

## BASIS FOR RELIEF

### A.    The Proposed Sale is in the Best Interests of the Debtors, Their Creditors and Their Estates

36.    Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of

2495166.1

the estate." 11 U.S.C. §363(b)(1).   A debtor in possession is given these rights by

section 1107(a) of the Bankruptcy Code.  *See* 11 U.S.C. §1107(a).  Moreover, section 105(a) of

the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."   11 U.S.C.

§105(a).

37.    Courts have uniformly held that approval of a proposed sale of property pursuant

to section 363(b) of the Bankruptcy Code is appropriate if a court finds that the transaction

represents a reasonable business judgment on the part of the debtor.  See *e.g., In re Chateaugay*

*Corp.,* 973 F.2d 141 (2d Cir. 1992); *Comm. of Equity Sec. Holders v. Lionel Corp (In re Lionel*

*Corp.).* 772 F.2d 1063, 1071 (2d Cir. 1983); *In re Adelphia Commc'ns Corp.,* No. 02-41729

(REG) (Bankr. S.D.N.Y. July 31, 2002).   *See also Official Comm. of Sub. Bondholders v.*

*Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal*

*dismissed,* 3 F.3d 49 (2d Cir. 1993), quoting *Van Gorkom,* 488 A.2d 858, 872 (Del. 1985) ("the

business judgment rule 'is a presumption that in making a business decision the directors of a

corporation acted on an informed basis, in good faith and in the honest belief that the action was

in the best interest of the company'," which has continued applicability in bankruptcy).

38.    Courts generally show great deference to a debtor in possession's decisions when

applying the business judgment standard.  *See In re Global Crossing, Ltd.,* 295 B.R. 726, 744

n.58 (Bankr. S.D.N.Y. 2003) ("[T]he Court does not believe that it is appropriate for a

bankruptcy court to substitute its own business judgment for that of the [d]ebtors and their

advisors, so long as they have satisfied the requirements articulated in the caselaw.").  Deference

is inappropriate only if such business judgment is "so manifestly unreasonable that it could not

be based on sound business judgment, but only on bad faith, or whim or caprice."  *Lubrizol*

2495166.1

*Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043, 1047 (4th Cir. 1985). *See also, In re Integrated Res., Inc.,* 147 B.R. at 656 (there is a strong presumption "that in making a business decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company").

39.    A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders.  See *e.g., In re Lionel Corp.*, 722 F.2d at 1071.  In fact, the paramount goal in any proposed sale of property is to maximize the proceeds received by the estate.  *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.,* 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greater overall benefit possible for the estate.") (quoting *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

40.    Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales.  *See In re Montgomery Ward Holding Corp.*, Case No. 97-1409(PJW) (Bankr. D. Del. Aug. 6, 1997); *In re Fruehauf Trailer Corp.*, Case No. 96-LS63(PJW) (Bankr. D. Del. Feb. 26, 1997); *In re Integrated Res.*, 147 B.R. at 659 (such procedures are created to "encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules

17

for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

41.     The Debtors submit that the proposed sale to a Successful Bidder satisfies the "sound business reason test" and represents a prudent and proper exercise of the Debtors' business judgment.  The Debtors believe that a prompt sale of the Assets by Auction is the only way to maximize the value of the Debtors' estates, to preserve jobs and to ensure the continued operations of Nirvana's water bottling business.

42.     The Debtors believe that the Bidding Procedures are the best method by which they can obtain the best price for the Assets and provide interested persons with accurate and reasonable notice of the proposed sale.  The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction, thereby increasing the likelihood that the Debtors will receive the best possible consideration for the Assets.  The Bidding Procedures also will enable the Debtors to undertake the auction process in as expeditious a manner as possible, which the Debtors believe is essential to maintaining and maximizing the value of their estates.

43.     The Debtors believe that the best way to maximize the value of the Assets is to sell them as a single group, and part of a going concern, as set forth in the Purchase Agreement. In the event, however, that the Debtors do not receive any Qualified Bids for the Assets as a single group, the Debtors will entertain offers for the Assets in separate lots.

44.     Finally, the Debtors believe that it is in the best interests of their estates to assume and assign the Contracts and Leases to the Successful Bidder in order to ensure the continued operation of Nirvana's water bottling business.  A debtor in possession may assume an executor

18

contract where assumption is a reasonable exercise of its business judgment.  *See* 11 U.S.C.
§ 365(a); *see e.g., In re Stable Mews Assoc., Inc.,* 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984);
*Allied Technology, Inc. v. R.B. Brunemann & Sons, Inc.,* 25 B.R. 484 (Bankr. S.D. Ohio 1982);
*see also In re Extraction Techs.,* 296 B.R. 393, 399 (Bankr. E.D. Va. 2001); *In re Richmond
Metal Finishers,* 756 F.2d at 1046-47.  This requirement is satisfied where a debtor in possession
determines in good faith that assumption of an executor contract will benefit the estate.  *See In re
Gucci,* 193 B.R. 411, 414-15 (S.D.N.Y. 1996).

45.     It is unlikely that any other alternative, other than the sale, will, at this time,
provide a higher value for the Assets, which supports the conclusion that the Debtors have
exercised their good and prudent business judgment in proceeding with the proposed sale.
Accordingly, the sale should be approved.  Moreover, as set forth hereinafter, accurate and
reasonable notice will be provided to all parties who indicate an interest with respect to the
Assets, who previously indicated an interest in the Assets, and to all creditors and other parties in
interest in compliance with the Bankruptcy Code and the Bankruptcy Rules.

46.     All aspects of the proposed sale have been handled in good faith.  The Purchase
Agreement is the product of detailed good faith discussions between counsel for the Debtors and
counsel for the Prepetition Secured Lenders, and is similar to those approved in other cases.

**B.      The Proposed Bidding Procedures are in the Best Interests of the Debtors, Their
         Creditors and their Estates**

47.     The Bidding Procedures outlined herein are designed to strike a balance between
inviting competitive bids and enabling the Debtors to close a sale of the Assets within a
reasonable time frame.  The Bidding Procedures are fair, reasonable and necessary to promote
the highest or best sale price, without imposing undue obstacles to the competitive bidding
process.

2495166.1

48.     The Bidding Procedures are a necessary tool to maximize the value of the Debtors' estates and will not unduly hamper the submission of competing bids.  Rather, the Bidding Procedures will insure that only parties with (a) a serious and legitimate interest in acquiring the Assets and (b) the financial means to consummate a transaction quickly, will participate in an open Auction process.

49.     The Bidding Procedures require competing bids to be placed at $100,000.00 increments and no party is seeking a break-up fee or other bid protections in connection with its participation in the Asset sale process.

50.     For the foregoing reasons, the Debtors respectfully submit that this Court should authorize and approve the Bidding Procedures pursuant to section 363(b) of the Bankruptcy Code.

## C.     The Purchase Agreement Should be Approved

51.     Section 363(f) of the Bankruptcy Code[9] permits debtors, with court approval, to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).

---

[9]   Section 363(f) of the Bankruptcy Code provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if --

| | |
|---|---|
| (1) | applicable nonbankruptcy law permits sale of such property free and clear of such interest; |
| (2) | such entity consents; |
| (3) | such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; |
| (4) | such interest is in bona fide dispute; or |
| (5) | such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. |

11 U.S.C. §363(f).

2495166.1

52.     In the instant case, the Assets are encumbered by security interests and liens perfected by the Prepetition Secured Lenders securing the repayment of obligations totaling approximately $27,204,092.28 as of the Petition Date.  With respect to any party asserting a Lien against the Assets, the Debtors believe that they will be able to satisfy one or more of the conditions set forth in § 363(f).  In particular, the Debtors believe that creditors with any interests in the Assets and/or Contracts and Leases, including the Prepetition Secured Lenders, will consent to a proposed sale free and clear of Liens, if applicable.  *See* 11 U.S.C. § 363(f)(2).  The Debtors will continue to negotiate with the Prepetition Secured Lenders concerning their respective claims pending the Sale Hearing.   To the extent such creditors do not consent explicitly or implicitly, the Debtors believe that the sale will satisfy one or more of the factors in section 363(f) and they will be permitted to sell the Assets free and clear of any interest in such property in accordance with the terms of the Purchase Agreement.

### D.     Purchaser's Good Faith

53.     Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *In re Chateaugay Corp.,* 1993 U.S. Dist. LEXIS 6130, at *9 (S.D.N.Y. 1993) (quoting *In re Abbotts Dairies of Penn., Inc.,* 788 F.2d 143, 147 (3d Cir. 1986)); *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 8 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985).

54.     The Purchase Agreement will be negotiated in good faith, with both parties represented by their own counsel.  The Debtors submit that the Successful Bidder's proposal, as contained in its respective Purchase Agreement, will represent the highest and best offer received for the Assets.

55.     Accordingly, the Sale Order should include a provision finding that the Successful Bidder for the Assets is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code.   The Debtors believe that providing the Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Assets and closing of the sale will occur promptly.

## PROPOSED SALE NOTICE AND PRIOR MOTIONS

56.     Attached hereto as **Exhibit E** is a copy of the Notice (the "Sale Notice") that the Debtors propose to serve upon (i) all potential Prospective Purchasers identified by the Debtors; (ii) the Office of the United States Trustee for the Northern District of New York; (iii) counsel for the Prepetition Secured Lenders; (iv) counsel for any committee appointed in these cases; (v) all parties to the Contracts and Leases, (vi) all creditors of the Debtors; and (vii) all entities known by the Debtors to have filed a notice of appearance or a request for receipt of chapter 11 notices and pleadings filed in Debtors' cases as of the notice date below.

57.     The Debtors propose to serve the Sale Notice via first class mail upon all designated parties not later than 5:00 p.m. on the third business day following the entry of the Bidding Procedures Order.  Such notice will provide all parties with more than twenty-five (25) days' notice of the October 20, 2015 Sale Hearing in compliance with Bankruptcy Rule 2002(a)(2).

58.     Under all of the relevant facts and circumstances herein and the nature of the relief requested herein, the Debtors respectfully submit that the form of the proposed Sale Notice should be deemed adequate and sufficient notice of the sale, the Sale Hearing, the Bidding Procedures, and the Motion, and respectfully request that the Court enter an Order approving the form and manner of the Sale Notice.

2495166.1

59.    No previous request for the relief sought herein has been made to this or any other Court.

**WHEREFORE,** the Debtors respectfully request that the Court (i) at the conclusion of the initial hearing, enter the Bidding Procedures Order approving the Bidding Procedures, the form and manner of the Sale Notice and scheduling the Sale Hearing, (ii) at the conclusion of the Sale Hearing, enter the Sale Order to be provided by Debtors authorizing the sale of the Assets to the Successful Bidder that submits the highest and best offer for the Assets in accordance with the Bidding Procedures, (iii) at the conclusion of the Sale Hearing, enter an order authorizing the Debtors to assume and assign the Contracts and Leases to the Successful Bidder, and (iv) granting the Debtors such other relief as the Court may deem just and proper.

Dated:   June 16, 2015             Respectfully submitted,
         Syracuse, New York

                                   BOND, SCHOENECK & KING, PLLC

                          By:      ____/s/  Camille W. Hill_____
                                   Stephen A. Donato, Esq., Bar Roll No. 101522
                                   Camille W. Hill, Esq., Bar Roll No. 501876
                                   Proposed Counsel for debtors and debtors in
                                   possession Nirvana, Inc., Nirvana Transport, Inc.
                                   Nirvana Warehousing, Inc. and Millers Wood
                                   Development Corp.
                                   Office and Post Office Address:
                                   One Lincoln Center
                                   Syracuse, New York 13202
                                   Tel: (315) 218-8000
                                   Fax: (315) 218-8100
                                   Email:  sdonato@bsk.com
                                           chill@bsk.com

2495166.1

and

TEITELBAUM & BASKIN, LLC
Jay Teitelbaum, Esq.
Proposed Special Counsel to the Debtors
Office and Post Office Address:
1 Barker Avenue, Third Floor
White Plains, New York  10606
Tel:  (914) 437-7670
Fax: (914) 437-7672
Email:  jteitelbaum@tblawllp.com